Mabel L. MARCERON, Appellant,

v.

CHEVY CHASE SERVICES, INC., a corporation, trading as Chevy Chase Funeral Home, Appellee.

No. 14199.

United States Court of Appeals
District of Columbia Circuit.

Argued March 21, 1958.

Decided July 17, 1958.

Mr. Frederick Stohlman, Washington, D. C., with whom Messrs. Clarence G. Pechacek and George H. Beuchert, Jr., Washington, D. C., were on the brief, for appellant.

Mr. Samuel J. L'Hommedieu, Washington, D. C., for appellee.

Before EDGERTON, Chief Judge, and FAHY and BURGER, Circuit Judges.

BURGER, Circuit Judge.

This case involves the construction of the provisions of a lease providing for adjustment of rental by appraisal upon renewal. In 1945, Adams and Betts became interested in appellant's house and tract as a site for their proposed funeral home. The tract occupied the northeast corner of Wisconsin Avenue and Garrison Street, N. W. Since zoning laws precluded operation of a funeral home with frontage on Garrison Street, it was proposed during negotiations to subdivide the tract into two lots; a north lot with 90 feet frontage on Wisconsin Avenue and no frontage on Garrison Street, and a south lot with 17 feet frontage on Wisconsin Avenue, and 127 feet frontage on Garrison Street. The south lot was designated lot 1, and the other lot 2. The house was entirely on lot 2. Thus, a funeral home could then be established on lot 2 without violating the zoning laws.

At first, Adams and Betts considered buying or leasing only lot 2. But appellant was unwilling to split up her land, and insisted that the tract be taken as a unit, although she had no objection to subdividing the tract and leasing both lots to Adams and Betts as a single unit. Adams and Betts agreed, because they felt that control of lot 1 would benefit them in that no one else could use it and thus detract from the view and impressiveness of lot 2. On this basis the parties were prepared to enter into a lease.

The next problem was deciding upon the rent. Appellant was offered $4000 per annum for the two lots, which she accepted. That sum was derived by appraising the tract at $43,560, and then computing 8% of that figure, and adding $515 to cover taxes. The $4000 was allocated $3200 (80% of $4000) to lot 2 and $800 (20% of $4000) to lot 1, and these sums were written into two separate leases as annual rents. The two leases were independent of each other, except for a clause in each which provided that in the event one lot was repossessed by appellant, the lease for the other lot could be cancelled by appellant. The terms of the leases were for ten years each.

To provide for adjustment of rent to conform to changes in the value of the property in the ten year term of the original leases, a renewal clause was devised and written into each lease. If the leases were renewed, three appraisers were to be appointed; one by the lessor, one by the lessees, and one by the two appraisers so appointed. The appraisers were to compute the rent as follows:

As to lot 1:

"The appraisers shall then determine the then fair market *value of the leased premises, including the ninety (90) foot wide lot abutting* the North line of the ground demised under this lease, upon the assumption that the said abutting lot is subject to no restriction upon its use, for its most advantageous use or uses, and upon the further assumption that the land has no buildings or structures upon it. The rental for the ensuing ten (10) year period shall then be determined by the appraisers based upon a return to the lessor of eight per centum (8%) net per annum upon 20% of the *appraised value of the land* over and above real estate taxes." (Emphasis added.)

The provisions as to lot 2 were substantially similar:

"The appraisers shall determine the then fair market *value of the leased premises* for its most advantageous use or uses, *including the lot at the corner* of Garrison Street and Wisconsin Avenue, Northwest, upon the assumption that said corner lot is in the same ownership as the leased premises and can be jointly used therewith for any lawful use or uses, and that said lot is subject to no restriction upon its use, and upon the further assumption that the land has no buildings or structures upon it, and shall add to such land value

the sum of Seven Thousand Dollars ($7,000.00) as the assumed value of the building or buildings upon the land irrespective of the value of such structures or whether or not they then exist. The rental for the ensuing ten (10) year period shall then be determined by the appraisers based upon a return to the lessor of eight per centum (8%) net per annum upon 80% of the *appraised value of the land* plus $7,000.00 over and above real estate taxes." (Emphasis added.)

The present dispute arose over the question whether "the land," a phrase found at the end of each of the quoted paragraphs, meant the entire tract, i. e., both lots; or merely the single lot covered by the lease. A difference in annual rental of over $3000 is controlled by this construction.

In 1955, when the lease was about to expire, appellee [1] elected to renew, and in accordance with the terms of the lease, appraisers were appointed. They appraised the entire tract at $109,909. Then, taking the phrase "the land" to mean only the single lot covered by the particular lease, they computed annual rent for the two lots combined to be $6141,[2] and advised the parties of their conclusions. Appellant refused to accept the appraisers' interpretation of the formulae (under her interpretation, the annual rent would have been $9353 for the two lots combined), and made known to them her disagreement. When the

---

1. In 1950, the tenants Adams and Betts, with appellant's approval, assigned their leases to appellee Chevy Chase Services, Inc., which continued to carry on the business, and of which Betts was stockholder and president.

2. Taking "the land" to mean the entire tract, the computation of the annual rent for lot 1 would be 8% of 20% of $109,909, or $1759; and for lot 2, 8% of 80% of ($109,909 plus $7000), or $7594; or a combined rent of $9353. On the other hand, taking "the land" to mean merely the single lot covered by the particular lease resulted in the following steps: first the appraisers divided the $109,909 into two sums representing the

true value of lots 1 and 2. Lot 1 was valued at $35,203, and lot 2 was valued at $75,706. Then they took 8% of 20% of $35,203, and arrived at the rent for lot 1, and 8% of 80% of $75,706 plus $7000, and arrived at the rent for lot 2. Accordingly, the rents for lots 1 and 2 were $563 and $5341 respectively. Since the lease specified a minimum rental of $800 for lot 1, the figure of $563 was raised to $800. The combined annual rent was thus $6141. Note: During the first ten years, the rent included a sum to cover taxes which would be paid by appellant. The rent for renewal periods was not to include a tax allowance, and taxes were to be paid by appellee.

appraisers declined to apply the formulae as contended for by appellant she threatened to evict appellee unless the rents were paid according to her version of the formulae.

Appellee then sued for injunction and for judgment declaring the interpretation of the formulae adopted by the appraisers to be binding on the parties. After a trial, the trial court held "the appraisers did exactly what the language of the leases specified they should do and the parties are bound by the report and appraisal of the committee of appraisers," and "if the language of the leases is ambiguous or indefinite, it must be construed most favorable to the lessee."

■ The lease provides that the rent "shall be determined by a committee of appraisers," whose appraisal "shall be binding upon the lessee and the lessor *as to the question of rental value of the leased premises.*" (Emphasis added.) The italicized language suggests that finality is restricted to "value." This language does not grant to the appraisers final and binding power beyond this.

■ In effect arbitrators are private judges[3] whose powers are defined by contract and to a degree by custom. Appraisers, by definition perform a narrower function, that merely of fixing value.[4] But in either case—whether appraisers or arbitrators—they do not bind principals or contracting parties when they go beyond the authority delegated to them. When they exceed that authority their decision in the area of that departure is not binding; their interpretation of their charter of authority, unlike the valuation, is subject to judicial review.[5]

■■ Here we are dealing with appraisers appointed solely to appraise value of real estate and its rental value. To be sure they had to make a preliminary or tentative interpretation of their instructions and powers as defined in the leases. But that does not carry with it *power to do so with finality.* The parties *could* have vested such final authority in third persons, but it is not to be implied from a grant of authority *to appraise value.*[6]

■■ Thus it appears that the appraisers' construction of the formulae can properly be reviewed by the trial court and by us. The appraisers' construction of the formulae, as distinguished from appraisal of value, being ultra vires, is clothed with no presumption of correctness. The trial court's affirmance of the appraisers' determination is likewise no obstacle to de novo construction in this court, first because the trial court's decision was based

---

3. Burchell v. Marsh, 1854, 17 How. 344, 349, 58 U.S. 344, 349, 15 L.Ed. 96.

4. "But when, as here, the parties had agreed that one should sell and the other buy a specific thing, and the price should be a valuation fixed by persons agreed upon, it cannot be said there was any dispute or difference. Such an arrangement precludes or prevents difference, and is not intended to settle any which has arisen. This seems to be the distinction between an arbitration and an appraisement, though the first term is often used when the other is more appropriate." City of Omaha v. Omaha Water Co., 1910, 218 U.S. 180, 194, 30 S.Ct. 615, 617, 54 L.Ed. 991.

5. Arbitrators have no authority to deviate from their instructions, McCormick v. Gray, 1851, 13 How. 26, 54 U.S. 26, 14 L.Ed. 36, and their award may be set aside if they exceed their authority, United States v. Farragut, 1874, 22 Wall. 406, 89 U.S. 406, 22 L.Ed. 879. And, ordinarily, a decision by an arbitrator as to the scope of the authority conferred upon him is not binding, Mutual Benefit Health & Accident Ass'n v. United Casualty Co., 1 Cir., 142 F.2d 390, certiorari denied 1944, 323 U.S. 729, 65 S.Ct. 65, 89 L.Ed. 585.

6. Some statements of the appraisers themselves suggest that their interpretation was not intended to bind the parties. E. g., "Only for the purposes of clarification and/or enlightenment did we break this down [to $35,203 for lot 1 and $75,706 for lot 2];" and "Since the sum total of our valuation [$109,909] remains the same, it seems to me that the lessor and lessee should be able to arrive at the new rental if they intended that it be on the total valuation."

partly on an erroneous ground, namely that the appraisers' interpretation of their own charter of authority was conclusive on the parties; and second, because unlike the question of land or rental value, it is one purely of law and involves only construction of a written instrument.

Taking the leases by themselves, without reference to extrinsic evidence, the appraisers' and the trial court's interpretation is unreasonable on its face. The quoted paragraphs open with the direction that "the leased premises," expressly defined to include the entire tract, shall be appraised. The unit of appraisal is the entire tract, even though covered by separate leases. The paragraphs end with the direction that rent be computed to be 8% of a certain fraction "of the appraised value of the land." The only appraisal called for was of the entire tract, and hence we think the most reasonable construction of "the land" is the same as "the leased premises," which is to say, the entire tract. True, it would have been clearer had the words "including lot 1 and lot 2" been added to the phrase "the land." But even without such clarification we think that meaning is reasonably clearly contemplated.[7]

Reference to evidence of the surrounding circumstances also affirms that the construction we take is the only reasonable one. First, as the trial court said, the formula contended for by appellant is common practice in determining fair annual rent. Second, the rent for the first ten year period was determined in accordance with appellant's version of the formulae, and there is no sign that the parties intended that the rent for the second ten year period be computed in any different way. Third, and perhaps the most significant test, under the appraisers' interpretation of their instructions, now contended for by appellees, the renewal rent for lot 1 comes out *lower* than the original rent for that lot ($563 as compared to $800; see note 2 supra), although the property increased in value by more than two and one-half times. Since the leases conclusively demonstrate an intent that the rent is to go up or down with the rise or fall in the value of the leased property, the appellee's contentions are in direct conflict with the obvious intent of the contracting parties. We hold that the renewal rent shall be computed in accordance with the terms of the lease, taking the phrase "the appraised value of the land" appearing in the last sentence of the quoted paragraphs to mean "the appraised value of lots 1 and 2 combined."

The appraisal machinery employed by the parties here is a familiar one in leases, as in other contracts. Lessors and lessees, sellers, and buyers, on a long term basis cannot safely commit themselves to static rents or prices. Such "escalator clauses" as this have long been used as a means of fairly resolving continuing contractual relations, more especially leases, on a basis equitable to both parties. Such a contract device should not be distorted into a means of producing reduced rents in the face of increased land values as found by the appraisers, and of increased land and rental values generally, factors fully covered in this record.

The judgment of the District Court is vacated and the case remanded for the entry of judgment not inconsistent with this opinion.

*Reversed and remanded.*

---

7. Appellee suggests that the ambiguity should be resolved in its favor, following the general rule that where there is any uncertainty as to renewals, the tenant and not the landlord is favored. 1930, 68 A.L.R. 157. We do not find such uncertainty in the present case as would warrant invocation of this rule.