**ADKINS LIMITED PARTNERSHIP, et al., Appellants,**

v.

**O STREET MANAGEMENT, LLC, et al., Appellees.**

**Nos. 11–CV–1181, 12–CV–89.**

District of Columbia Court of Appeals.

Argued June 21, 2012.

Decided Oct. 25, 2012.

Robert L. Bell, Washington, DC, for appellants.

Paul J. Kiernan, Washington, DC, with whom Michelle T. Hess was on the brief, for appellees.

Before BLACKBURNE–RIGSBY, OBERLY, and BECKWITH, Associate Judges.

OBERLY, Associate Judge:

Adkins Limited Partnership and representatives of its former partners (collectively, "Adkins") appeal two orders of the trial court in a suit brought by O Street Management, LLC ("OSM"), to enforce its right to buy out Adkins' seventy-five percent interest in O Street Roadside, LLC, a company formed by OSM and Adkins for the purpose of owning, developing, leasing, and managing two parcels of real property in Washington, D.C. Adkins appeals the trial court's September 16, 2011, order cancelling Adkins' notice of pendency of action (*lis pendens*) and the trial court's January 12, 2012, order confirming the appraiser's valuation of Adkins' buy-out interest and ordering settlement. We affirm the trial court's order confirming the appraisal; because the valuation of the buy-out was the only remaining issue pending before the trial court, Adkins' challenge to the order cancelling the *lis pendens* becomes moot with our affirmance.

## I. Background

In a Memorandum Opinion and Judgment issued on May 20, 2010, this court affirmed the trial court's grant of declaratory judgment to OSM, holding that under the Operating Agreement for O Street Roadside, LLC, signed by both OSM and Adkins, OSM was entitled to exercise a buy-out of Adkins' seventy-five percent membership interest in the company upon the incapacitation of the last of Adkins' surviving general partners (Cilla Adkins). *Adkins v. O St.*, No. 09–CV–1067, Mem. Op. & J., 995 A.2d 230 (D.C. May 20, 2010). O Street Roadside's primary asset consisted of two parcels of land covering two city blocks in Northwest Washington, D.C. (the "O Street property"). The larger of the two parcels was improved with a Giant Food grocery store and an historic masonry building, known as the O Street Market, occupied by a variety of small vendors. The smaller parcel was an undeveloped site with no improvements. The Operating Agreement between the parties incorporated a master lease for the entire property with Giant Food Stores/GFS Realty, Inc. ("Giant"), for twenty-five years plus five five-year renewal options, which we recognized gave "Giant complete control over the retail or commercial development of the [O Street] property in return

for the rent payments." *Adkins*, 09–CV–1067 at 2. In our May 2010 decision, we held that under the Operating Agreement, OSM, as the managing member of O Street Roadside, had not breached any contractual or fiduciary duties to Adkins when it negotiated with Giant to develop the O Street property, and we affirmed the trial court's conclusion that Adkins' rights in the property "were limited to, and would be protected by, O Street Management's exercise of a buy-out provision." *Id.*

Following this court's decision, the only issue left to resolve was what price OSM would pay Adkins in the buy-out. The Operating Agreement established the following process for determining the value of the membership interest:

> The withdrawing Member or the Representative and the purchasing Member shall each appoint an appraiser to determine the fair market value of the Membership Interest of the withdrawing Member.... If the fair market values set forth in the appraisals do not differ by more than Fifty Thousand Dollars ($50,000), then the average of the two appraisal values shall be the Purchase Price of the Interest. If the fair market values set forth in the appraisals differ by more than Fifty Thousand Dollars ($50,000), then the appraisers shall together promptly appoint a third appraiser who shall appraise the fair market value of the Interest and who shall render a separate written report setting forth its valuation and the basis upon which such fair market value was established. The value set forth in [the] third appraisal shall be the Purchase Price of the Interest, except as follows: (i) if the fair market value contained in the ap-

praisal report is greater than the higher of the first two appraisals, then the higher of the first two appraisals shall be the Purchase Price and (ii) if the fair market value contained in the appraisal report is less than the lower of the first two appraisals, then the lower of the first two appraisals shall be the Purchase Price.

Adkins' appraiser valued Adkins' seventy-five percent interest in O Street Roadside at $22,033,000, which was based on a real estate appraisal prepared for Adkins that appraised the O Street property at $37,900,000. The $37.9 million real estate appraisal valued the fee simple interest in the property, *i.e.*, the ownership interest in property where the owner has the exclusive and complete rights to do whatever it wishes with the property. The fee simple appraisal was prepared based on the assumption that the O Street property would be developed as the mixed-use project ("City Market at O") that OSM and another development company, Roadside Development, LLC,[1] had proposed for the property. OSM's appraiser valued Adkins' seventy-five percent interest in O Street Roadside at $721,000, which was based on a real estate appraisal prepared for OSM that appraised the O Street property at $10 million. The $10 million real estate appraisal valued the leased fee interest in the property, *i.e.*, the ownership interest in property that is encumbered by a lease. The leased fee appraisal applied a discounted cash flow analysis, using the fixed schedule of annual rental payments from Giant for the remaining forty-four years of the lease—assuming Giant would exercise the renewal options—and assessing the reversionary interest in the land once the lease expired,[2] valuing the land at its maxi-

1. Roadside Development, LLC, is a Washington, D.C.–based real estate development company, whose members are all also members of OSM.

2. A reversionary interest in leased property is the future interest that the landlord has in that property when the lease ends.

mally productive use, which OSM's appraiser identified as a high-rise multifamily residential development.

More than a year after preparing its first valuation, Adkins prepared a revised valuation in light of the availability of a November 2007 appraisal prepared for Roadside Development and OSM for purposes of the City Market at O project that valued the fee simple interest in the property at $54 million. OSM and Roadside Development's $54 million appraisal was conducted assuming that City Market at O had been approved for construction. Adkins' revised valuation, based on the $54 million appraisal, was $26 million, in contrast to its previous valuation of $22 million.

Because the independent appraisals completed by Adkins and OSM were not within $50,000 of each other, the trial court, per the Operating Agreement, ordered the parties to appoint a third, neutral appraiser. The information submitted to the third appraiser to prepare the valuation included OSM's $721,000 valuation report, Adkins' $22 million valuation report, the $37.9 million real estate appraisal, and the $10 million real estate appraisal (as well as the Operating Agreement, the master lease with Giant, and O Street Roadside's Return of Partnership Income for 2007)[3] Presented with valuation reports that valued different interests in the O Street Property and an Operating Agreement that did not specify whether to appraise the fee simple or leased fee interest—the single factor that accounted for the great discrepancy between the parties' valuations—the third appraiser requested guidance from the court. After briefing from both parties, the trial court agreed with OSM that the appraiser should ap-

praise the fair market value of the leased fee interest in the O Street property, not the value of the fee simple estate.

In assessing the fair market value of Adkins' seventy-five percent interest in O Street Roadside, the third appraiser used the book value of the company as of September 1, 2007, adjusted to reflect the fair market value of the company's assets, namely the O Street property. Consistent with the trial court's instructions, the third appraiser relied on OSM's real estate appraisal and valued the leased fee interest in the O Street property. The appraiser concluded that the company's total assets amounted to $10,140,228, which included the $10 million real estate appraisal and $140,228 in other assets. The company's liabilities amounted to $8,663,564. The appraiser calculated seventy-five percent of the company's assets less its liabilities, and he then discounted that number to reflect Adkins's non-controlling and non-marketable interest in the company. These calculations led the appraiser to conclude that Adkins' seventy-five percent ownership interest in O Street Roadside was $660,889, as of September 1, 2007.

OSM filed a motion to confirm the valuation and order settlement in accordance with the Operating Agreement, which provided that "if the fair market value contained in the [third appraiser's] appraisal report is less than the lower of the first two appraisals, then the lower of the first two appraisals shall be the Purchase Price." Under these terms, OSM's appraisal of $721,000 was the price OSM had to pay Adkins in the buy-out. Adkins filed a motion to vacate the valuation, arguing that: (1) it was "tainted by deception and other undue means" because the third appraiser was biased in favor of OSM; (2)

---

**3.** It is unclear from the record whether either the $54 million real estate appraisal or Adkins' $26 million valuation was submitted to the third appraiser, but neither of these docu-

ments was on the list of sources that the third appraiser considered in preparing his valuation.

the third appraiser failed to consider important financial documents relating to OSM's agreements with Giant and its application for Tax Increment Financing ("TIF") for the City Market at O project; (3) the valuation date of September 1, 2007, was unfair and improper;[4] (4) and by valuing the leased fee interest in the property instead of using the $54 million or $37.9 million fee simple appraisals, the third appraiser undervalued Adkins' ownership interest.

In September 2011, in the middle of this litigation, Adkins filed a *lis pendens.* OSM immediately moved to cancel it, which the trial court did, concluding that Adkins "no longer retain[ed] any ownership interest in the property." As the trial court noted in its September 2011 order, "[t]he only issue left to be decided by this court is how much the plaintiff must pay the defendant in the buy-out."

The trial court ultimately granted OSM's motion to confirm the valuation and order settlement, finding that the third appraisal was completed in accordance with the Operating Agreement, the ap-

praiser had all the material he needed to value Adkins' interest in O Street Roadside, and Adkins presented no evidence to support its contention that the appraiser was biased in favor of OSM. Adkins appealed the orders cancelling the *lis pendens* and affirming the valuation, and this court consolidated those appeals.

## II. The Buy–Out Valuation

■ Adkins repeats many of its arguments on appeal and includes some additional ones, contending generally that the award should be vacated because it was "procured by corruption, fraud, or other undue means." D.C.Code § 16–4423(a)(1) (Supp.2008). Adkins argues that the trial court usurped the third appraiser's independent judgment by ordering him to value Adkins' membership interest in O Street Roadside using the leased fee interest in the O Street property and that the third appraiser instead should have valued the fee simple interest.[5] Adkins also contends that the trial court abused its discretion in denying its request for additional discovery to obtain certain financial documents in OSM's possession.[6]

---

4. Adkins does not specifically pursue this argument on appeal, and we do not address it at length in this opinion. A more appropriate valuation date might have been closer to the time of the event triggering the buy-out—in April 2008 after Adkins' last surviving partner (Cilla Adkins) was adjudicated incapacitated and OSM sent Adkins' counsel and the representatives of Cilla Adkins notice of its intent to exercise its rights under the buy-out provision. There is no evidence, however, that the valuation would have been materially different if the calculations had been performed in April 2008.

5. These instructions, in Adkins' view, amounted to a judicial taking of Adkins' property in violation of the Fifth Amendment. *See* U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation"). This argument is without merit for several reasons, not the least of which is that the property interest that Adkins alleges was taken was not transferred for public use.

Rather, the trial court was overseeing OSM's exercise of a contractual buy-out right between two private parties.

6. Adkins makes the general argument throughout its brief that it was denied a fair and impartial appraisal process because the third appraiser and the trial court were biased in favor of OSM and did not exercise independent judgment. The result, according to Adkins, is a "grossly undervalued" appraisal of its ownership interest in O Street Roadside. Adkins has presented no evidence to support its claim that OSM is "engaged in an ongoing deceptive scheme to defraud Adkins of the fair valuation buy-out purchase price of Adkins' majority membership interest in O Street Roadside, LLC." Adkins merely repeats conclusory statements throughout its brief. Adkins also makes a frivolous argument that the trial court was biased in favor of OSM because it served as OSM's agent by "receiving and holding checks" for OSM. These

## A. Standard of Review

The rules governing review of agreements to determine property values through an appraisal process are the same as those governing review of arbitration agreements. *Washington Auto. Co. v. 1828 L St. Assocs.,* 906 A.2d 869, 875 (D.C. 2006) ("[A] written agreement to settle an existing or future dispute regarding the value of land or other property via an appraisal process is, for purposes of the [District of Columbia Arbitration Act], an arbitration agreement enforceable as provided in the Act and Superior Court Civil Rule 70–I."). "We review *de novo* a trial court's judgment confirming an [appraisal]. Judicial review of [appraisals], however, is limited." *Cathedral Ave. Coop., Inc. v. Carter,* 947 A.2d 1143, 1151 (D.C.2008) (citation and internal quotation marks omitted). An appraiser's valuation of property "may be vacated or modified only on grounds clearly specified by statute." *Shore v. Groom Law Grp.,* 877 A.2d 86, 91 (D.C.2005) (internal quotation marks omitted). Moreover, this court generally will not review an appraiser's valuation on the merits, unless it appears the appraiser "manifestly disregarded the law" or exceeded the scope of his authority, *Cathedral Ave. Coop.,* 947 A.2d at 1151. "To allow the courts routinely to second-guess the judgment of an appraiser chosen by the parties would serve only to undercut the efficacy of the parties' own agreement and to thwart the policy of encouraging informal and inexpensive resolutions of such matters." *Doggett v. McLachlen Bancshares Corp.,* 663 A.2d 511, 515 (D.C. 1995) (internal quotation marks omitted).

## B. The Trial Court's Instructions

Adkins takes issue with the trial court's act of instructing the appraiser on what interest to value. In addressing this argument, it is important first to note that Adkins did not object below to the appraiser's request for instructions and instead filed briefs in support of its position that the appraiser should value the fee simple interest in the O Street property as if it were unencumbered by the Giant lease. Adkins has thereby forfeited the argument that the trial court should not have instructed the appraiser, and we are not obliged to consider it on appeal. *See Duk Hea Oh v. National Capital Revitalization Corp.,* 7 A.3d 997, 1010 (D.C.2010) ("[A] defendant may not take one position at trial and a contradictory position on appeal.") (internal quotation marks omitted).

But even assuming Adkins has not forfeited this argument, we do not believe it was improper for the trial court to instruct the appraiser to value the leased fee interest in the O Street property. Ordinarily, a trial court's role in reviewing an appraisal is limited, as is its role in reviewing arbitration awards. When the parties have agreed only for the appraisal of a specific thing and the contract does not provide for an appraiser to settle a particular dispute, however, an appraiser's role is more limited than the role of an arbitrator, *i.e.,* the appraiser's task is "merely [that] of fixing value." *Marceron v. Chevy Chase Servs., Inc.,* 258 F.2d 155, 158 & n. 4 (D.C.Cir.1958) (citing *City of Omaha v. Omaha Water Co.,* 218 U.S. 180, 194, 30 S.Ct. 615, 54 L.Ed. 991 (1910) ("An arbitration implies a difference, a dispute, and involves ordinarily a hearing and all thereby implied.... But when, as here, the parties had agreed that one should sell and the other buy a specific thing, and the price should be a valuation fixed by persons agreed upon, it cannot be said that there was any dispute or difference. Such an arrangement precludes or

checks were settlement payments made payable to Adkins and were tendered to the court

because Adkins refused to participate in the settlement process.

prevents difference, and is not intended to settle any which has arisen. This seems to be the distinction between an arbitration and an appraisement, though the first term is often used when the other is more appropriate.")).

■■■■ Of course, an appraiser "may use any reasonable method of appraisal it deems appropriate, unless the [contract] specifies otherwise," *Doggett*, 663 A.2d at 517 n. 8, and we "will not question" the value fixed by the appraiser that the parties have chosen "in the absence of fraud or mistake." *Id.* at 515. However, when an appraiser must interpret the meaning of a legal document—a contract between parties—before he may perform his appraisal, that interpretation is subject to judicial review. A court "will defer to the appraiser's interpretation of the lease as long as it is reasonable and does not exceed the appraiser's authority," *Doggett*, 663 A.2d at 516, but the court noted in *Marceron* that unlike the actual appraisal of value, which is accorded deference, an appraiser's interpretation of his instructions as set forth in a contract is "clothed with no presumption of correctness." *Marceron*, 258 F.2d at 158 (holding that the appraisers' interpretation of the lease was "unreasonable on its face" because they had appraised the value of a single lot instead of the entire tract, contrary to the language of the lease). The interest that the parties intended the appraiser to value is a question of contract interpretation going to the scope of the appraiser's authority; it is a question of law that the trial court—and this court on appeal—reviews *de novo. Marceron*, 258 F.2d at 158–59; *Doggett*, 663 A.2d at 516. *Cf. Motor City Drive, L.L.C. v. Brennan Beer Gorman Monk Architects & Interiors, P.L.L.C.*, 890 A.2d 233, 236 (D.C.2006) ("Whether an issue is arbitrable is a question of law, and a court must make its own determination on the issue.") (alterations and internal quotation marks omitted).

The Operating Agreement in this case did not clearly identify the property interest the parties intended to be valued. The Operating Agreement stated only that the third appraiser chosen by the parties "shall appraise the fair market value of the [membership] Interest" in O Street Roadside. In responding to the appraiser's request for guidance on whether he should value the O Street property in fee simple or as a leased fee interest (either one of which could have been an appropriate way to determine the fair market value of Adkins' interest in O Street Roadside depending on the parties' intent), the trial court was interpreting the contract to determine the scope of the appraiser's authority; it was not usurping the role of the appraiser and improperly directing the appraisal process. Whether the trial court's instructions were correct is the question to which we next turn.

**C. The Leased Fee Interest**

■■■ Apart from its challenge to the trial court's act of instructing the third appraiser, Adkins contends that the instructions themselves were wrong as a matter of law because the appraiser should have been required to base his valuation on the fee simple interest in the O Street property. According to Adkins, *Funger v. Maizels*, 377 A.2d 70, 73 (D.C.1977), established a general rule that in determining the fair market value of property, "the property shall be valued in terms of its highest and best use" as though it were vacant and unencumbered by a lease. The court in *Funger*, however, was interpreting the terms of a landlord-tenant contract that provided for reassessment of rental fees every ten years based on appraisals that the parties agreed would be made "as if the Leased Land were vacant, unencumbered, unimproved, and not under Lease." *Id. Funger* is very different from this case, which involves a contractual buy-out provi-

sion with no limiting terms other than the specification that fair market value should be the standard used in assessing the buy-out interest in O Street Roadside.

 "Fair market value is defined as the price that would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." *Withers v. Wilson*, 989 A.2d 1117, 1120 (D.C.2010) (internal quotation marks omitted). *See also Estate of Mitchell v. Commissioner*, 101 T.C.M. (CCH) 1435, 2011 WL 1598623, at *5 (2011) ("Fair market value is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under compulsion to buy or to sell."). If real estate is encumbered by a lease, the ownership interest in that property is considered a leased fee interest rather than a fee simple interest because "the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease)." APPRAISAL INSTITUTE, THE DICTIONARY OF REAL ESTATE APPRAISAL (5th ed.2010) (defining leased fee interest). An appraisal of the fair market value of a leased fee interest in real estate "values a leased-fee interest subject to the actual lease" because a potential buyer would take the property subject to the lease. *Estate of Mitchell*, 101 T.C.M. (CCH) 1435, 2011 WL 1598623, at *6. The rights that an owner of a leased fee interest has in the leased property include "the right to receive lease payments and the reversionary interest when the lease expires." *Id.*

This court already has held that O Street Roadside's rights in the O Street property—and Adkins' rights in the property as a member of O Street Roadside— were limited by the long-term master lease with Giant. *Adkins*, 09–CV–1067. We held that neither O Street Roadside nor its members retained any possessory or de-

velopment rights in the property. *Id.* Adkins therefore has a seventy-five percent interest in a company that has a leased fee interest in the O Street property. An assessment of the fair market value of the O Street property at the time of the buy-out—what a willing buyer would pay a willing seller having knowledge of the relevant facts—must incorporate the lease. It was appropriate, then, for the trial court to instruct the third appraiser to use the leased fee interest in determining the fair market value of the O Street property.

Adkins nonetheless insists that a fair valuation of its interest in O Street Roadside would necessarily have incorporated either the $54 million appraisal or the $37.9 million appraisal. But these appraisals valued the fee simple interest in the O Street property as if it were unencumbered by the Giant lease and assuming that the City Market at O project had been approved for construction. These appraisals were not relevant to Adkins' interest in the company at the time of the buy-out.

### D. Adkins' Discovery Request

Adkins argues that it was entitled to certain financial documents and agreements between OSM and Giant, which it asserts were necessary to complete a "fair valuation of the assets and opportunities of O Street Roadside." In its motion to vacate the third appraiser's valuation, Adkins sought documents related to the $250 million City Market at O project submitted with the application for TIF financing, including budgets, tax credit analysis, financial statements, and cash flow projections. In its order confirming the valuation and ordering settlement, the trial court denied Adkins' request, finding no good cause to compel OSM to turn over the financial documents.

Under Super. Ct. Civ. R. 70–I(b), "[p]roceedings upon [a motion to confirm an appraisal] shall be summary with discovery permitted only upon a showing of good cause," and "a decision on a discovery motion" is ordinarily reviewed for abuse of discretion. *Dada v. Children's Nat'l Med. Ctr.*, 763 A.2d 1113, 1115 (D.C. 2000). "[T]he burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents. But 'good cause' may ordinarily be sustained by a claim that the requested documents are necessary to establishment of the moving party's claim or that denial of production would cause the moving party undue hardship or injustice." *Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C.Cir.1968) (citation and internal quotation marks omitted).

We hold that the trial court did not abuse its discretion in ruling that Adkins failed to show "good cause" to order OSM to produce sensitive and confidential information that OSM advised the trial court would put it and Giant at a competitive disadvantage. Contrary to Adkins' assertion, in our May 2010 order, we "voice[d] no opinion" on whether the documents Adkins sought would be relevant to the valuation of Adkins' ownership interest in O Street Roadside. On this record, it is not clear that the financial information Adkins wants would be relevant to such a valuation at the time of the buy-out, which seems to have occurred before the TIF financing or any plans for development had been approved. Upon the triggering of the buy-out in April 2008, Adkins no longer had any right to participate in the decisions of O Street Roadside and no rights in the development plans that OSM and Roadside Development were pursuing with Giant. Roadside Development's proposal for TIF financing was not approved until October 2008. Moreover, Adkins has not shown that the appraiser lacked information or documents necessary to conduct a fair appraisal of Adkins' ownership interest in O Street Roadside, nor has it demonstrated that denial of production caused it any undue hardship or injustice.

## III. *Lis Pendens* Cancellation

Because we affirm the trial court's order confirming the valuation—the "sole matter" that was pending before the trial court—there is no "action or proceeding ... affecting the title to or tenancy interest in, or asserting a mortgage, lien, security interest, or other ownership interest in real property situated in the District of Columbia." D.C.Code § 42–1207(a) (2010). Adkins' challenge to the trial court's order cancelling the *lis pendens* is therefore moot. *See McNair Builders, Inc. v. 1629 16th St., L.L.C.*, 968 A.2d 505, 507 (D.C. 2009) ("[A] *lis pendens* shall be cancelled '[i]f judgment is rendered in the action ... against the party who filed the notice.' ") (quoting D.C.Code § 42–1207(d)) (second alteration in original).

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*