*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-13

ADKINS LIMITED PARTNERSHIP, APPELLANT,

V.

O STREET MANAGEMENT, LLC, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-8137-18)

(Hon. William M. Jackson, Trial Judge)

(Argued April 20, 2021                    Decided July 14, 2022)

*Ronald C. Jessamy*, with whom *Robert L. Bell* was on the brief, for appellant.

*Paul Kiernan* for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL, *Associate Judge*, and WASHINGTON, *Senior Judge*.

DEAHL, *Associate Judge*:  In 2001, Adkins Limited Partnership and O Street Management (OSM) jointly formed O Street Roadside, LLC, to develop a large piece of real estate in the District's Shaw neighborhood.  The death of one Adkins partner and the incapacitation of another triggered a buyout provision in Roadside's operating agreement, allowing OSM to buy Adkins out of its seventy-five percent

interest in Roadside. That led to an initial round of litigation, and in 2009, the Superior Court ruled that OSM was entitled to buy Adkins out of its interest. We affirmed that decision the following year. In 2012, the Superior Court issued a second order resolving the only issue left open by the first round of litigation—the buyout price that OSM would have to pay to acquire Adkins' ownership interest in Roadside. The court confirmed the price as $721,000, and we again affirmed.

For various reasons, OSM never actually bought Adkins out of its interest in Roadside. Each party casts blame on the other for that failure. OSM complains that Adkins refused to accept the payments it tendered shortly after the buyout price was set. Adkins counters that it had not exhausted its appeals at that point, and that once it had done so in 2013, it made clear it was ready to accept payment and settle, but OSM refused. In 2018, after repeated failed attempts to procure the buyout payment from OSM, Adkins recorded the 2012 order setting the buyout price and filed a complaint in the Superior Court to enforce it as a "final judgment or final decree for the payment of money." *See* D.C. Code § 15-101 (2012 Repl.). The trial court dismissed Adkins' complaint, ruling that the 2012 order was not a "final judgment or final decree for the payment of money" and was therefore not enforceable as a money judgment under D.C. Code § 15-101.

Adkins now appeals, contending that the 2012 order was an enforceable money judgment under § 15-101. In the alternative, it argues that it was deprived of its interest in Roadside without just compensation, in violation of the Fifth Amendment's Takings Clause. We disagree with Adkins on both points and affirm.

**I.**

This dispute has come before this court twice before. *Adkins Ltd. P'ship v. O St. Mgmt.*, No. 09-CV-1067, Mem. Op. & J. (May 20, 2010) *(Adkins I)*; *Adkins Ltd. P'ship v. O St. Mgmt.*, 56 A.3d 1159 (D.C. 2012) *(Adkins II)*. In 2001, Adkins and OSM became the joint owners of Roadside, which was formed to manage valuable real estate that was previously owned by Adkins alone. The real estate is located at the site of the historic O Street Market, at 9th and O Streets NW, and it now houses a multi-use development, including a Giant supermarket. *Adkins II*, 56 A.3d at 1162. Adkins contributed the property to Roadside, and received a seventy-five percent interest in the venture. OSM acquired the remaining twenty-five percent interest in Roadside, and in exchange agreed to pay off substantial liens encumbering the property and other obligations of Adkins. *Adkins I*, *supra*, at 2.

In 2008, one Adkins partner died and the other was deemed incapacitated, so that the partnership was dissolved. This triggered an "Optional Buy-Out" provision

in the Roadside operating agreement, which permitted OSM to purchase Adkins'
interest in Roadside at fair-market value, with twenty-five percent down and the
balance payable in installments over a period of five years.  OSM filed suit in the
Superior Court for a declaratory judgment that it could enforce the buyout provision,
and the court ruled in 2009 that OSM was entitled to buy Adkins out of its interest.
This court affirmed that ruling the following year in *Adkins I*.

After that affirmance, the only remaining dispute between the parties was the
buyout price that OSM would have to pay Adkins in exchange for its interest in
Roadside.  Per Roadside's operating agreement, in the event Adkins and OSM failed
to agree to a purchase price, the price would be determined via an appraisal process.
At the first stage of that process, each party would appoint an appraiser to assess the
fair-market value of Adkins' interest.  If the results of those appraisals were within
$50,000, the purchase price would be the average of the two.  If the appraisals were
further apart than $50,000, that would trigger the second stage of the appraisal
process, in which a third and neutral appraiser would be appointed.  The median of
the three appraisals, i.e., the price in the middle, would then be set as the buyout
price.

The parties did not agree on a purchase price, and their appointed appraisers were tens of millions of dollars apart. Adkins' appraiser valued Adkins' interest at $22 million, while OSM's appraiser assessed Adkins' interest as worth only $721,000, or about 3% of Adkins' valuation. The chasm between the two appraisals stemmed from Adkins' appraiser calculating its ownership interest as a fee simple interest, whereas OSM's appraiser assessed it as a leased fee interest. *Adkins*, 56 A.3d at 1163. The difference between the two led to a third appraiser being appointed. The court directed the third appraiser to treat Adkins' interest as a leased fee interest—in line with OSM's appraiser—and the third appraiser concluded the Adkins' interest was worth $660,889. That left $721,000 as the middle and therefore controlling figure for buying out Adkins' interest. OSM promptly wrote to Adkins offering to settle at that price. Adkins refused, contending that the appraisal had been "predicated on factual and legal errors so egregious that the report, among other things, can be deemed irrational, arbitrary and capricious."

In response to Adkins' refusal to settle, OSM moved the Superior Court to confirm the $721,000 buyout price and order settlement. In its motion, OSM asked the court to "direct[] the execution of appropriate documents and payment of required amounts so that the buyout is completed no later than August 2, 2011." Around the same time, OSM began depositing settlement funds—paid in

installments as dictated by the agreement—into the Superior Court registry, "[i]n order to avoid any argument that [OSM] had not complied with its payment obligations." The court granted OSM's motion, confirmed the valuation, and ordered settlement, though it did not order that settlement be completed by any particular date, as OSM had requested.[1] The court also returned to OSM all payments it had paid into the court registry.

We affirmed the trial court's decision in a published opinion. *Adkins II*, 56 A.3d at 1169. We explained that, following our 2010 decision, the "only issue left to be decided" was "how much [OSM] *must pay* [Adkins] in the buy-out," *id.* at 1165 (emphasis added), and agreed with the Superior Court that "$721,000 was the price OSM *had to pay* Adkins" in order to buy it out. *Id.* at 1164-65 (emphasis added). Adkins, still dissatisfied with what it believed to be an erroneous valuation, unsuccessfully petitioned this court for en banc review, and then petitioned the Supreme Court for a writ of certiorari, which was likewise denied. 569 U.S. 1005 (May 28, 2013) (No. 12-1283).

---

[1] In fact, the court did not rule on OSM's motion until January 2012, more than five months after the date that OSM had sought to establish as a deadline for settlement.

Shortly thereafter, with its litigation options exhausted, Adkins approached OSM to complete the settlement process. OSM demurred. It was no longer interested in pursuing settlement; instead, it obstructed it. It first refused to pay the court-ordered buyout amount until Adkins obtained court confirmation as to who was authorized to wind up Adkins' affairs following its dissolution, noting that "such authorization . . . would come from the DC Superior Court."[2] In an attempt to placate OSM, Adkins filed a complaint in the Superior Court naming OSM as defendant and requesting a declaratory judgment confirming the administrators of the Adkins' estates. But OSM moved to dismiss the complaint for failure to state a claim, which the trial court granted, because Adkins did "not allege that [OSM] has done or failed to do anything for which it could be held liable," or even that OSM disputed Adkins' position on the matter. In its dismissal order, the court reiterated that the 2012 litigation had "concluded . . . with the issuance of an opinion . . . that [OSM] *must pay* [Adkins] $721,000 for the buyout of [Adkins'] interest." (emphasis added).

---

[2] This was an about-face for OSM. Earlier in the litigation, while OSM had expressed some uncertainty about who had "the authority to represent or act for the dissolved Adkins Limited Partnership," it nonetheless was content to proceed with the settlement process by "preparing a note payable to 'Adkins Limited Partnership in dissolution.'" OSM's late-breaking refusal to pay Adkins absent court confirmation of who was to receive the funds, and its subsequent efforts to thwart the very court confirmation it demanded, appear to have been tactics to delay or avoid altogether paying Adkins the buyout amount.

For a second time, Adkins wrote to OSM requesting settlement. In response, OSM reiterated its demand that Adkins produce an "order or document" confirming the identity of the authorized representatives of the dissolved partnership. About six months later, Adkins complied and sent a third letter requesting payment, this time enclosing an order from the Fairfax County Circuit Court confirming the identity of the administrators of the Adkins estates. At this point, OSM switched tactics and offered to settle for $300,000, or about 40% of the court-ordered buyout price of $721,000. It asserted that the substantial reduction was justified because Adkins should be responsible for three-quarters of Roadside's legal fees from the preceding litigation. Adkins rejected that offer and turned back to the courts to recover the full court-ordered buyout price of $721,000.

To that end, Adkins filed the Superior Court's 2012 order confirming $721,000 as the buyout price with the District's Recorder of Deeds in 2018. It then filed a complaint seeking to enforce that order as a money judgment against OSM. *See* D.C. Code § 15-101. On OSM's motion, the trial court dismissed Adkins' complaint, finding that (1) the 2012 order was not a "final judgment or final decree for the payment of money," *id.*, and (2) if the court construed Adkins' complaint as a claim for breach of contract, the statute of limitations for that claim had expired.

Adkins now appeals, challenging only the first of those rulings, while making clear that it "did not assert or raise a breach of contract claim below."

## II.

On appeal, the parties dispute whether the 2012 order was a "final judgment or final decree for the payment of money" under D.C. Code § 15-101. That provision provides that "every final judgment or final decree for the payment of money rendered in the . . . Superior Court of the District of Columbia" is enforceable for twelve years "when filed and recorded in the office of the Recorder of Deeds." There is no dispute that the 2012 order was final and recorded.[3] The question is whether it was a judgment or decree "for the payment of money," as Adkins maintains, in which case it is enforceable and the trial court erred in dismissing its complaint. OSM's contrary position, adopted by the trial court, is that the 2012 order was not a

---

[3] OSM briefly suggests that the 2012 order was not a *judgment* because it was not "set out in a separate document," per the requirements of Sup. Ct. R. Civ. Proc. 58. We have soundly rejected that argument in the past. In *Robinson v. Georgetown Court Condominium, LLC*, we held that Rule 58's separate-document requirement is meant only to "clarify when the time for appeal begins to run," and does not create a "litmus test of what, when filed and recorded with the Recorder of Deeds," amounts to an enforceable judgment. 39 A.3d 1286, 1289 (D.C. 2012) (quoting *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 384 (1978) (per curiam)); *see also Zuniga v. Whiting-Turner Contracting Co.*, 270 A.3d 897, 901-02 (D.C. 2022) ("In legal usage, the term 'judgment' is commonly understood to include *any* final court order from which an appeal may be taken.").

money judgment but instead was "merely an Order confirming the valuation" and providing the parties with an "opportunity to execute under the operating agreement."

We agree with the trial court that the 2012 order was not an enforceable money judgment under D.C. Code § 15-101. The 2012 order did not direct the payment of any money, but merely set a purchase price to be paid if the parties completed the buyout per the terms of the operating agreement.

Adkins complains that, under this interpretation, the 2012 order and the more recent dismissal of Adkins' enforcement action amount to a judicial taking, divesting Adkins of its seventy-five percent interest in Roadside without any compensation. That's wrong. First, it is not at all clear that Adkins has been divested in its interest in Roadside at all, where (1) OSM never paid the court-ordered price for a buyout, (2) the parties never culminated the buyout through payment and settlement, and (3) no party sought to enforce the court orders, via a contempt motion or otherwise, directing settlement at the court-ordered purchase price of $721,000. Second, even if Adkins has been divested of its interest in Roadside, that was not by virtue of any government action taking its property for public use, but via enforcement of a

contract between private parties. That is not a colorable Takings Clause claim. *Adkins II*, 56 A.3d at 1165 n.5.

We address each of those two points in more detail, in turn.

**A.**

We review de novo the trial court's dismissal of Adkins' complaint. *See Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 78 (D.C. 2017); *see also Robinson*, 39 A.3d at 1288. The propriety of that dismissal turns on whether the 2012 court order was an enforceable money judgment. The relevant statute allows a judgment creditor to record and enforce judgments and decrees for the payment of money under the following terms:

> [E]very final judgment or final decree for the payment of money rendered in the . . . Superior Court of the District of Columbia, when filed and recorded in the office of the Recorder of Deeds of the District of Columbia, is enforceable, by execution issued thereon, for the period of twelve years only from the date when an execution might first be issued thereon.

D.C. Code § 15-101. When such a money judgment is recorded, it "shall constitute a lien" on the real property of the judgment debtor. D.C. Code § 15-102(a) (2012 Repl.). The statute does not further define what constitutes a "final judgment or final

decree for the payment of money," or indicate any precise form in which it must be recorded. *Robinson*, 39 A.3d at 1288.

The plain text of D.C. Code § 15-101 applies only to judgments that direct "the payment of money," as opposed to the performance of some other action. Here, the 2012 order that Adkins recorded contains no such command. It is an eleven-page order devoid of any directive to pay any amount of money whatsoever. Its closing decretal language, setting forth the relief granted, states only that OSM's "Motion to Confirm Valuation and Order Settlement is GRANTED." In substance, the order confirms a buyout price and orders the parties to settle. Although settlement would seemingly entail OSM paying the established buyout price of $721,000—albeit in installments over five years, as provided in the operating agreement—the court's directive was not for any immediate payment, and the payments envisioned were contingent on Adkins carrying out its own settlement obligations. In short, the 2012 order on its face did not direct OSM to pay Adkins money, as it would have to do to be considered a money judgment under § 15-101.

Adkins persists that we should look past the plain terms of the 2012 order and assess its "functional and practical effect." We disagree. The central purpose of recording statutes, like §§ 15-101 *et seq.*, "is to furnish means of notice" to third

parties. *Staples v. Warren*, 46 App. D.C. 363, 372 (D.C. Cir. 1917); *Robinson*, 39 A.3d at 1288. It is therefore imperative, for a recorded judgment to be enforceable under § 15-101, that it include a clear statement establishing the liability of the judgment debtor and ordering the payment of money in satisfaction of that liability. That is necessary to ensure third parties can discern whether and in what amount a lien exists on any given property. A more "functional" approach—asking third parties to discern the "practical" import of a court ruling against a backdrop they likely have no knowledge of—would undermine the notification purposes of § 15-101.

The case Adkins principally relies upon as support for its contrary view, *Robinson*, only confirms the above analysis. *Robinson* concerned a recorded docket sheet, which included an entry that read: "10/20/06 Plaintiff Granted Money Judgment in the amount of $78,946.85." 39 A.3d at 1290. Interpreting the same language that we are concerned with here under § 15-101, we held that the docket sheet was an enforceable final judgment for the payment of money under § 15-102. *Id.* at 1291. In doing so, we explained that the docket entry (1) "plainly is a 'decree for the payment of money,'" (2) "states plainly in whose favor the judgment was entered," (3) "in brief and simple terms" states the amount owed, so that (4) "anyone reading it can see against whom" and in what amount "the judgment was entered."

*Id.* at 1290-91. None of those things is true of the 2012 order here. We also stressed in *Robinson*, as further evidence that the docket was an enforceable judgment, that it "contain[ed] no recital of pleadings" and "no fact-finding or legal reasoning," *id.* at 1290, all in marked contrast to the eleven-page order here which included each of those things. *See generally* D.C. Super. Ct. Civ. R. 54(a) ("A judgment should not include recitals of pleadings, a master's report, or a record of prior proceedings.").

Moreover, even if we were to assess the "practical and functional effects" of the 2012 order, as Adkins urges, the 2012 order is not practically or functionally a directive for the payment of money. As OSM persuasively argues, its duty to pay Adkins the $721,000 buyout price was contingent on Adkins carrying out its own settlement obligations. OSM was under no obligation to pay Adkins until that happened. An interested third party, presented with only the recorded 2012 order, would have no way of knowing whether Adkins had satisfied its end of the bargain, and so would have no way of knowing whether OSM was obliged to pay $721,000 (or if there was actually a $721,000 lien on OSM's real property).

In short, the 2012 order is not a judgment or decree for the payment of money, and so is not enforceable as a recorded money judgment under § 15-101.

**B.**

Adkins next argues that the Superior Court's dismissal divested it of its seventy-five percent interest in Roadside without just compensation, in contravention of the Takings Clause of the Fifth Amendment. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envt'l Prot.*, 560 U.S. 702, 714 (2010) (per curiam) ("Our precedents provide no support for the proposition that takings effected by the judicial branch are entitled to special treatment, and in fact suggest the contrary."). We rejected a similar Takings Clause challenge from Adkins a decade ago, observing that the Superior Court did not confiscate Adkins' property for any public use when it established the buyout price as $721,000, but merely enforced a contract between private parties. *Adkins II*, 56 A.3d at 1165 n.5. Adkins' latest iteration of the argument arises in a slightly different posture, but it meets the same fate. It now argues the Superior Court's recent refusal to enforce that $721,000 buyout price as a money judgment has divested it of property without just compensation.

First, we doubt the premise of Adkins' argument that it has been divested of its interest in Roadside at all. Both parties seem to assume Adkins has been divested

of that interest, but there is little basis for that assumption. There is no court order divesting Adkins of that interest or transferring it to OSM. The 2009 order granting OSM declaratory relief, as we described it in our 2010 affirmance, provided only that OSM was "*entitled to exercise* the buy-out of Adkins' interest," *Adkins I*, *supra*, at 2 (emphasis added), not that it had already completed the buyout. Those orders did not command that Adkins' interest be transferred to OSM if OSM did not in fact pay the required buyout price, as it has failed to do to this date. Rather, they treated any buyout as prospective and a two-way street, with both parties required to take the steps necessary to complete the buyout. For instance, the Superior Court's December 16, 2009, order specified that "should either party refuse to participate" in the buyout process, "the other party may seek immediate relief from the Court to ensure that that buy-out process stays on track." The same is true of the 2012 order, which we likewise affirmed; neither the order itself nor our affirmance of it suggested (much less decreed) that Adkins was divested of its seventy-five percent interest in Roadside. As discussed above, the 2012 order confirmed the value of Adkins' interest, set that as the buyout price, and directed the parties to settle. Nothing more. It did not provide that Adkins had been divested of its interest prior to the anticipated, but never realized, consummation of the buyout.

When pressed at oral argument on the point, OSM maintained that despite its failure to pay the required buyout amount, Adkins was divested of its interest in Roadside once the trial court recognized OSM's right to buy Adkins out of its interest. Not so. Being entitled to buy out Adkins and having actually done so are two different things. The language of the trial court's 2012 order makes clear that the buyout process was not yet completed, and that in order to complete it, OSM would have to pay Adkins $721,000 and Adkins would have to perform its end of the settlement. But neither of those things ever happened because OSM refused to pay, the parties never settled, and neither party sought the court's intervention to compel the buyout to proceed.[4] In short, while OSM was surely entitled to buy Adkins out of its interest, it never in fact did so.[5]

---

[4] The trial court's 2012 order directing the parties to settle and setting a buyout price of $721,000, while not enforceable as a money judgment, may remain enforceable via the trial court's contempt power (though the passage of a decade complicates that issue). *See generally Bolden v. Bolden*, 376 A.2d 430, 432-33 (D.C. 1977). OSM argues that because the 2012 order was decided in its favor, and granted the relief it requested, that order is not enforceable against it. We disagree. The 2012 order directed the parties to proceed to settlement, and OSM is not exempted from that directive merely because it sought that relief.

[5] OSM blames Adkins for that failure. It complains that Adkins refused to settle promptly, thereby excusing OSM's later refusal to pay the full buyout price. Maybe, but that is neither here nor there. OSM had a host of remedies at its disposal if it thought Adkins had not complied with its court-ordered obligations to settle. It could have moved to hold Adkins in contempt of the 2012 order, or even asked for the court to reduce the buyout price to offset its post-2012-order litigation costs (as

Second, even if we assume that Adkins has somehow been divested of its interest in Roadside, the Takings Clause is not implicated in any way. The relevant Superior Court orders and our affirmances of them from 2009 to 2012 did nothing but enforce the buyout process agreed to by these private parties. As we have already explained, those prior orders did not confiscate any property for public use, but merely permitted "OSM's exercise of a contractual buy-out right between two private parties." *Adkins II*, 56 A.3d at 1165 n.5. Similarly, the 2019 dismissal that Adkins now appeals did not confiscate any property or alter property rights in any manner whatsoever. Adkins' argument that it did depends on a premise that we have already rejected, that the 2012 order was a money judgment so that the trial court's failure to enforce it as such deprived it of a vested monetary interest. We have already explained, *supra* Part II.A., why that premise is mistaken.

We conclude that Adkins' takings claim fails because none of the relevant Superior Court orders divested Adkins of its interest in Roadside at all, nor would those orders amount to a taking even if they did. It is possible that Adkins has been divested of its interest in Roadside through some other mechanism outside of those

---

OSM attempted to do unilaterally). Instead, it resorted to self-help and simply refused to pay. That was OSM's decision to make. But by refusing to pay, it failed to finalize the buyout.

court orders—perhaps by forfeiting its right to the buyout payment, as OSM suggests—but we do not decide that issue today. It may, however, be a topic for future litigation in these already protracted proceedings. The only court-ordered route toward divesting Adkins of its interest in Roadside was for OSM to pay it the required $721,000, and it has not done that.

## III.

We affirm the judgment of the Superior Court.

*So ordered*.