# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JASON TERRELL, | § | |
| | § | No. 299, 2022 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2021-0248 |
| KIROMIC BIOPHARMA, INC., | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: February 8, 2023
Decided: May 4, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **REVERSED AND REMANDED.**

Scott James Leonhardt, Esquire, Jason A. Gibson, Esquire, THE ROSNER LAW GROUP LLC, Wilmington, Delaware; Alexander Klein, Esquire, (*argued*) BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP, Garden City, New York, *for Appellant Jason Terrell.*

Laurence V. Cronin, Esquire, Kelly A. Green, Esquire, SMITH, KATZENSTEIN & JENKINS, LLP, Wilmington, Delaware; Robert S. Friedman, Esquire, Joshua I. Schlenger, Esquire (*argued*), Katherine Anne Boy Skipsey, Esquire, SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP, New York, New York, *for Appellee Kiromic Biopharma, Inc.*

**TRAYNOR**, Justice:

In an action seeking declaratory and injunctive relief, the Court of Chancery was asked to resolve a dispute between a company and one of its former directors over the meaning of a stock option agreement and option grant notice. Applying the plain text of the agreement, the Court of Chancery determined that the dispute was to be resolved in accordance with a board committee's interpretation of the agreement and notice. After the board, acting through a committee, interpreted the agreement and notice in a manner favorable to the company, the Court of Chancery, without hearing further from the former director, promptly dismissed the former director's complaint for lack of subject matter jurisdiction.

In this opinion, we hold that the Court of Chancery properly stayed the action to permit the board's committee to interpret the agreement and notice in the first instance. We disagree, however, with the court's decision to dismiss the former director's complaint without any meaningful review of the committee's interpretation. We therefore reverse the Court of Chancery's order of dismissal and remand for a review of the committee's conclusions consistent with the guidance provided in this opinion.

I

A

Dr. Jason Terrell is a former consultant to and director of Kiromic Biopharma, Inc., a Texas-based biopharmaceutical company incorporated in Delaware.[1] He initially joined Kiromic as an outside consultant in 2014 before joining the company's board in 2017. Terrell served on Kiromic's board until irreconcilable differences caused him to resign his seat in 2019.

Terrell was compensated for his work at the company through three stock-option grants, which, following Terrell's and the Court of Chancery's lead, we refer to as Agreements 1, 2, and 3. Agreement 1, which Kiromic and Terrell entered into on December 10, 2014, in exchange for his consulting services, granted Terrell options to purchase 500,000 shares of the company's common stock at a strike price of $0.50 per share. The exercise term for these options was set to expire on December 10, 2024.

Agreement 2, entered into on January 23, 2017, to compensate Terrell for his appointment to the company's board of directors, extended Terrell the right to purchase 500,004 shares of common stock at a strike price of $0.17 per share. The exercise term for this agreement was scheduled to expire on January 23, 2027.

---

[1] We draw the relevant facts from Terrell's March 22, 2021 Verified Complaint for Declaratory Judgment and Specific Performance and the documents attached to it as exhibits.

Terrell received his third, and final, grant of options on November 10, 2017, in exchange for his commitment to continue serving on the company's board. Agreement 3 provided Terrell the option to purchase 500,004 shares of common stock at a strike price of $0.19 per share and, like the first two agreements, carried an exercise term of ten years.

Altogether these three stock-option agreements extended Terrell the right to purchase approximately 1.5 million shares of Kiromic common stock. This number comports with a 2015 email from Kiromic's then-CEO to Terrell informing him: "you will receive in stock options your 500k shares for your consultant [sic] plus the 1 million shares for your position [o]n the board."[2]

The dispute in this case arose out of the parties' competing interpretations of Agreement 3. This agreement comprises three component parts: a Notice of Stock Option Grant (the "Grant Notice"), a Stock Option Agreement, and the 2017 Equity Incentive Plan. It also varies from the first two agreements in two critical respects. First, Agreement 3, unlike Agreements 1 and 2, contains a provision modifying its options in the event of a reverse stock split. Stock splits in 2019 and 2020 subsequently revised Terrell's options under the third agreement to the right to purchase 14,285 shares of common stock at a strike price of approximately $6.65 per share.

---

[2] App. to Opening Br. at A29.

This reduction in value to Agreement 3's options magnified the agreement's second critical difference from the earlier two: the existence of a provision in the Grant Notice that we will refer to as the "Release." It is italicized and reads:

> *By signing this Grant Notice, you acknowledge and agree that other than the Shares [governed by the Grant Notice], you have no other rights to any other options, equity awards or other securities of the Company (except securities of the Company, if any, issued to you on or prior to the date hereof, if any), notwithstanding any commitment or communication regarding options, equity awards or other securities of the Company made prior to the date hereof, whether written or oral, including any reference to the contrary that may be set forth in your offer letter, consultant agreement or other documentation with the Company or any of its predecessors.*[3]

Kiromic believes that this language extinguished Terrell's right to the options extended in Agreements 1 and 2, leaving Terrell with the right to purchase only 14,285 shares of the company's common stock at a strike price of $6.65 per share.[4] Stated differently, it is Kiromic's position that the option to purchase the 500,004 shares granted in Agreement 3 supplanted the options to purchase the one million shares granted in Agreements 1 and 2.

Terrell, on the other hand, contends that the parenthetical language, which excepts from the Release "securities of the Company, if any, issued to you on or prior to the date hereof, if any[,]" clearly preserves the options granted in Agreements 1 and 2.[5] Terrell therefore maintains that he should have the right to

---

[3] *Id.* at A35 (italics in original).
[4] *Id.* at A112–13.
[5] *Id.* at A130–31.

purchase 500,000 shares of Kiromic common stock at $0.50 per share; 500,004 shares at $0.17 per share; and 14,285 shares at $6.65 per share.

The parties' divergent interpretations of Agreement 3 prompted Terrell to file a declaratory-judgment and specific-performance action in the Court of Chancery. Specifically, Terrell asked the court to declare that Agreements 1 and 2 remained valid and binding contracts and to compel Kiromic to reserve for the options provided in them. Kiromic responded by filing a motion to dismiss Terrell's complaint for failing to state a claim upon which relief could be granted. The parties' briefs on Kiromic's motion addressed their competing interpretations of the Release.

While preparing for oral argument on the motion, the Court of Chancery discovered an alternative-dispute-resolution ("ADR") provision in the parties' Stock Option Agreement that appeared to govern its interpretation. The provision—Section 15.1—provides that:

> Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee or the Company to the Committee for review. The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee.[6]

The "Committee," according to the 2017 Equity Incentive Plan, was to include at least one member of the company's board of directors and could either be "created and appointed by the [b]oard" or, if not created, be the board itself.[7]

---

[6] *Id.* at A45.
[7] *Id.* at A64.

Because neither party had discussed this provision in their briefs, the Court of Chancery requested supplemental briefing on whether the parties' dispute over the Release was covered by Section 15.1.

Kiromic, its attention now drawn to a new line of argument, argued that Section 15.1 barred the court from interpreting the Grant Notice because the Grant Notice was incorporated into the Stock Option Agreement; indeed, they both featured clauses incorporating the other.[8] This meant, for Kiromic, that the Committee had the exclusive authority to interpret the Release. Terrell, for his part, contended that his suit was not barred by the provision because, by its own terms, Section 15.1 only applied to the "Agreement," which the Stock Option Agreement defined as the Stock Option Agreement itself.[9] Accordingly, Terrell argued, the Committee's power to interpret the Stock Option Agreement did not extend to the Grant Notice and thus the court was responsible for interpreting the Release.

These arguments ultimately presented a problem for the court: deciding whether the parties' dispute was subject to Section 15.1 would require the court to interpret the Stock Option Agreement, a task that, it believed, was explicitly reserved to the Committee under the plain terms of the agreement. As the court described its

---

[8] *Id.* at A166. *See id.* at A45 (showing Section 15.2 of the Stock Option Agreement, which provides that "The Plan, the Grant Notice and the Exercise Agreement are each incorporated herein by reference."). *See also id.* at A34 (showing that the Grant Notice incorporated the Stock Option Agreement).

[9] *Id.* at A160.

dilemma, "[i]nterpreting the dispute resolution provision would require [the court] to resolve a 'dispute regarding the interpretation' of the stock option agreement, violating that dispute resolution provision."[10]  Turning for guidance to the Court of Chancery's ADR jurisprudence and, in particular, the court's comparative analysis of arbitration and non-arbitration ADR provisions, the court concluded that

> [b]ecause the dispute resolution provision does not call for arbitration, it must be construed in accordance with its plain text.  The text commands that the referenced committee must interpret the dispute resolution provision to determine its scope.[11]

Consequently, the court stayed the matter pending the Committee's determination. The court further ordered that, should the Committee determine that Section 15.1 applied to the parties' dispute over the Release in the Grant Notice, the parties were to submit their competing interpretations of the Release "for its review."[12]

As will be developed more fully below, the Committee determined that its authority to interpret the Agreement extended to the Release.  And after considering the parties' competing interpretations of the Release and its effect on the options granted under Agreements 1 and 2, the Committee found that the Release had "supersede[d] and nullifie[d]"[13] those earlier options grants.  The Committee did not offer its reasons for deciding as it did.

---

[10] *Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 175858, at *1 (Del. Ch. Jan. 20, 2022) [hereinafter "*Letter Opinion*"].
[11] *Id.*
[12] *Id.* at *7.
[13] App. to Opening Br. at A204.

Kiromic's attorneys promptly forwarded the Committee's legal conclusions to the Court of Chancery and, seven days later, the court copied the Committee's findings into a short order dismissing Terrell's action for lack of subject matter jurisdiction.[14] The court did not ask the Committee to explain its reasoning, request supplemental briefing from the parties, or offer any rationale for its dismissal beyond incorporating the reasons cited in its previous ruling. Terrell appealed.

B

Terrell now argues that the Court of Chancery committed three reversible errors. The first was the court's decision to enforce Section 15.1 because, according to Terrell, it was an unconscionable provision. Section 15.1 was unconscionable as interpreted and applied by the Court of Chancery, Terrell argues, because, among other things, it insulated the Committee's conclusory and self-interested determinations from judicial review.

The court's second error, Terrell contends, was its conclusion that Section 15.1 was not an arbitration provision. If the Vice Chancellor had held that Section 15.1 was an arbitration provision, Terrell explains, then the court, not the Committee, would have been the presumptive decision-maker tasked with determining its scope.

---

[14] *Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 3083229, at *1 (Del. Ch. Aug. 2, 2022).

Finally, the court's third error, Terrell argues, was its failure to review the Committee's determination before dismissing his action for lack of subject matter jurisdiction. Even if Section 15.1 had been properly categorized as a non-arbitration ADR provision, Terrell contends, the Court of Chancery was still required to subject the Committee's determination to some form of judicial review.

Kiromic, for its part, argues that the Court of Chancery was correct to dismiss Terrell's action without subjecting the Committee's decision to judicial review because the parties' dispute fell within the Committee's "exclusive" jurisdiction under the plain language of Section 15.1. In fact, during oral argument before this Court, Kiromic conceded that, in its view, the Court of Chancery would have been powerless to review the Committee's legal conclusions even if the Committee had based its determinations on a "contractual interpretation . . . that fl[ew] in the face of clear Delaware authority."[15]

II

Because the Court of Chancery's dismissal hinged upon its interpretation of the parties' contracts and, in particular, Section 15.1 of Agreement 3's Stock Option Agreement, our review is *de novo*.[16] And because Terrell's unconscionability claim,

---

[15] Oral Argument at 30:39–31:22, Terrell v. Kiromic Biopharma, Inc., 299, 2022, *available at* https://livestream.com/accounts/5969852/events/10726675/videos/234946220/player [hereinafter "Oral Argument"] (cleaned up).

[16] *See Munyan v. Daimler Chrysler Corp.*, 909 A.2d 133, 136 (Del. 2006) ("Questions of law are reviewed *de novo*."). *See also Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*, 654 A.2d 403, 406 (Del. 1995) ("We review *de novo* a ruling . . . denying a motion to dismiss.").

10

which was the lead argument in Terrell's briefs and at oral argument, depends in large part on the absence of judicial review, we address the Court of Chancery's deference to the Committee's determinations first.

A

Our analysis necessarily begins with the text of Section 15.1, which, in its entirety, reads:

> **Interpretation.**  Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee [Terrell] or the Company to the Committee for review.  The resolution of such a dispute by the Committee shall be final and binding on the Company and Optionee.[17]

The parties' dispute, however, turns on the interpretation of the Release, which is found not in the Stock Option Agreement but in the Grant Notice.  For this reason, the Court of Chancery's threshold task was to address questions surrounding Section 15.1's scope: Did the Committee's interpretative purview extend to the Grant Notice?  And was this question—as to Section 15.1's scope as opposed to its meaning—to be answered by the court or the Committee itself?

The first step in the Court of Chancery's analysis was determining whether the parties intended Section 15.1 to act as an arbitration provision.  This step was crucial because, if Section 15.1 were an arbitration provision, the court and not the Committee "would presumptively decide whether the Court or the Committee

---

[17] App. to Opening Br. at A45.

should determine its scope."[18]  By contrast, under Court of Chancery precedent, where an ADR provision contemplates a process other than arbitration, such as when the parties have entrusted a discrete decision to an expert, thus earning the label "expert determination," the court applies contract interpretation principles to determine the ADR provision's scope.[19]

The Court of Chancery concluded that Section 15.1 is not an arbitration provision and that the plain text dictates that the Committee is to decide its scope— that is, its applicability to the Release.  We agree.  We disagree, however, with the Court of Chancery's decision to forgo a review of the Committee's legal determinations, including as to Section 15.1's scope and its interpretation of the Release's effect on the previously granted options.

B

The observation that there is a cognizable—and, as this case shows, consequential—difference between arbitrations and expert determinations does not provide a sufficient guide that tells us how, in the absence of clear contractual language, to distinguish between the two.  Nor did the parties brief in the Court of Chancery "whether Section 15.1 calls for arbitration, an expert determination, a

---

[18] *Letter Opinion* at *5 (citing *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006)).

[19] *Id.* at *6 (citing *Penton Bus. Media Holdings, LLC v. Informa, PLC*, 252 A.3d 445, 465–66 (Del. Ch. 2018)).

12

referee, or something else."[20] But for the reason previously mentioned, the Court of Chancery was required to—and did—answer that question.

In examining whether Section 15.1 is an arbitration provision or a provision calling for something more closely resembling an "expert determination," the court followed Court of Chancery precedent recognizing that Delaware, unlike some of our sister states, recognizes a distinction between an arbitration and an expert determination. Of particular prominence in the court's discussion was Vice Chancellor Laster's cogent analysis in *Penton Business Media Holdings, Inc. v. Informa, PLC*.[21]

*Penton*'s taxonomical inquiry looked to New York because of its "well-developed body of expert-determination jurisprudence[.]"[22] In particular, *Penton* drew heavily from a 2013 Report by the New York City Bar Committee on International Commercial Disputes.[23] We too find that this report provides useful guidance in discerning whether a dispute-resolution provision contemplates arbitration or an expert determination:

> [T]he fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker. In the case of a typical

---

[20] *Id.* at *5.

[21] *See Penton*, 252 A.3d at 458 ("Delaware has not elided the distinction between expert determinations and arbitrations").

[22] *Id.* at 463.

[23] N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013) [hereinafter "New York Bar Report"].

13

expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact. The parties agree that the expert's determination of the disputed factual issue will be final and binding on them. The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability.

If the proceeding is an arbitration, this means that the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter. The grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial proceeding. The parties expect the arbitrator to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief. The parties, by agreeing to arbitration, are selecting a form of dispute resolution that by its very definition is understood as granting the decision maker the authority to make binding decisions of both law and fact.[24]

*Penton* also noted that, under New York law, a hallmark of expert determinations is that they are "attended by a larger measure of informality and [that experts] are not bound to the strict judicial investigation of an arbitration."[25]

The Court of Chancery applied this framework and determined that Section 15.1 is not an arbitration provision. We agree. Section 15.1 does not include procedural rules affording each side the opportunity to present their case—"a defining characteristic of arbitration provisions."[26] Although the parties in this case

---

[24] *Id.* at 4.
[25] *Penton*, 252 A.3d at 463 (citing *In re Delmar Box Co.*, 127 N.E.2d 808, 811 (N.Y. 1955)).
[26] *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *7 (Del. Ch. Jan. 29, 2019).

ultimately submitted competing letter briefs to the Committee for its review, they were ordered to do so by the Court of Chancery, not by the terms of Section 15.1 itself. Section 15.1 also lacks the broad scope of an arbitration—it only authorizes the Committee to make a limited, albeit critical, legal determination. And it does not empower the Committee to award relief, as one would expect in an arbitration.

But the Court of Chancery, applying this same framework, found that "Section 15.1 is not squarely an 'expert determination' either."[27] And to the extent that expert determinations are typically used to decide factual issues,[28] we agree.[29] We have not, however, been pointed to any authority holding that parties may not grant the authority to interpret a contract to an expert. The critical point here is that the provision in question—Section 15.1—is not an arbitration provision. Given that, and notwithstanding that Section 15.1 does not call for a classic expert determination, the Court of Chancery did not err by treating it as one. And the consequence of this distinction is that the issue of Section 15.1's scope, that is, its applicability to the Release in the Grant Notice, is to be decided not under arbitration principles, but by contract interpretation principles.

---

[27] *Letter Opinion* at *5.
[28] New York Bar Report at 4.
[29] We note further that no one has suggested that the decision-maker in this case—the Committee—was an expert in the field of contract interpretation.

15

C

Applying traditional principles of contract interpretation to Section 15.1, the question of who, in the first instance, decides the provision's scope is dictated by the plain language of the provision.[30] Here the Court of Chancery correctly concluded that it was the Committee's job to determine Section 15.1's scope. The Stock Option Agreement explicitly grants the Committee the authority to interpret the "Agreement," which is defined in the Stock Option Agreement as the Stock Option Agreement itself. Although Terrell and Kiromic disagree about whether the power to interpret the Stock Option Agreement extends to the Grant Notice, their arguments rely on competing interpretations of provisions in the Stock Option Agreement. In other words, one cannot reach the merits of either Terrell's or Kiromic's argument without conducting a careful review of the Stock Option Agreement itself. But such a review is reserved, by Section 15.1, to the Committee. Accordingly, the Committee must be given the first opportunity to interpret Section 15.1's scope. The Court of Chancery did not err in its interpretation of Section 15.1 on this point. The court properly stayed the action so that the Committee could determine whether Section 15.1 applies to the parties' dispute over the effect of the Release and, if it did, to review the parties' competing interpretations of it. We take up next what happened after the stay was entered.

---

[30] *Penton*, 252 A.3d at 465.

16

D

The parties submitted letter briefs to the Committee, "addressing both the threshold issue as to the scope of Section 15.1 and the question of whether the Release superseded Dr. Terrell's prior options agreements."[31] Four months later, Kiromic's counsel reported to the Court in a brief letter that the Committee had determined that:

i. the Committee has the exclusive authority, pursuant to Section 15.1 of Dr. Jason Terrell's Stock Option Agreement with Kiromic BioPharma, Inc., to interpret Dr. Terrell's November 2017 "Notice of Stock Option Grant"; and

ii. the merger clause in Dr. Terrell's grant notice supersedes and nullifies any option rights Dr. Terrell may have had under Dr. Terrell's prior agreements with Kiromic.[32]

In the letter, which did not explain the Committee's reasoning, Kiromic did not request any relief but, instead, politely advised the court that "[t]he parties are at the Court's disposal to provide any additional information the Court may require."[33] One week later, without hearing from Terrell, the Court of Chancery entered an order dismissing Terrell's action for lack of subject matter jurisdiction.

Terrell contends that the court's decision not to review the Committee's determinations was error. Kiromic, on the other hand, argues that even if it had wanted to, the court was powerless to conduct a judicial review of the Committee's

---

[31] App. to Opening Br. at A204.
[32] *Id.*
[33] *Id.*

17

conclusions. This was so, Kiromic contends, because the plain language of Section 15.1 granted the Committee the "exclusive responsibility" to interpret the parties' agreement.[34] According to Kiromic, this means that the Court of Chancery is bound to accept the Committee's interpretation even if it was contrary to clear Delaware authority.[35]

Delaware "is a freedom of contract state, with a policy of enforcing the voluntary agreements of sophisticated parties in commerce."[36] Yet Kiromic cites no authority in support of its claim that parties can *ex ante* contractually forgo their right to any and all forms of judicial review.[37] Nor does Kiromic point to any textual support in the parties' agreement for this position. This argument, moreover, lacks a limiting principle; it would permit the Committee, a conflicted party made up of three directors owing fiduciary duties to the company, to unfairly—even in bad

---

[34] Oral Argument at 26:51.

[35] *Id.* at 30:39–31:22.

[36] *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008), *aff'd*, 970 A.2d 256 (Del. 2009).

[37] For example, even where a contract may be silent on its prohibition against certain bad behaviors, public policy mandates that we recognize an implied covenant of good faith and fair dealing in every contract governed by Delaware law, which "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct [that] has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). And notably, "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009) (citing *Amirsaleh v. Bd. of Trade,* 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008) ("Simply put, the implied covenant requires that the discretion-exercising party make that decision in good faith."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) ("[I]f one party is given discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination."), *aff'd*, 575 A.2d 1131 (Del. 1990)).

faith—skew its determinations in the company's favor with impunity. We reject this contention as contrary to Delaware law,[38] and turn our attention to the standard by which the Court of Chancery should review the Committee's legal determinations.[39]

E

The most familiar form of expert determination—the use of an appraiser to conduct a valuation—has been previously reviewed by the Court of Chancery for fraud or bad faith. Most notably, in *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, the Court of Chancery considered the appropriate standard of review applicable to an appraiser's valuation of ownership interests in senior housing facilities in Florida.[40] The main defendant in that case argued that the court should "reach a *de novo* judgment as to the matters assigned to the appraisers by the contract."[41] Then-Chancellor Strine disagreed, holding that:

> Where, as here, (i) a contract written by one party (ii) says that that party will make a payment based on a formula, (iii) the formula says that an input into the formula will be determined by an appraiser, and (iv) the party making the payment gets the contractual right to select the appraiser, the parties have clearly agreed to be bound by that appraiser's professional judgment. Unless the party unhappy with the appraiser's judgment can show that the appraised market value resulted

---

[38] *See, e.g.*, *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1120 (Del. 2022) (requiring the good faith application of a contractual provision permitting "managers" to "make a subjective discretionary determination as to whether an indemnitee has met a specific standard of conduct."). *See also supra* note 37.

[39] It cannot be the narrow standard of review applicable to arbitral decisions because, as noted by the *Penton* court, arbitration principles do not apply to expert determinations. *Penton*, 252 A.3d at 454.

[40] 2013 WL 1955012, at *1, *3 (Del. Ch. May 13, 2013).

[41] *Id.* at *3.

19

from a concerted course of bad faith action between the appraiser and the other party—*i.e.*, a breach of contract by a party—or that the appraiser's result was otherwise tainted by the contractually improper conduct of the other party (such as intentionally providing the appraiser with false information to taint the valuation), the parties are stuck with what they bargained for. *The lack of room for law-trained judicial second-guessing makes sense because such unschooled second-guessing undercuts the parties' choice to have an expert on the relevant property type perform the task.*[42]

Although the contract at issue in *Senior Housing* bound the parties to the valuation reached by the appraiser, that language did not, according to the court, preclude a judge from reviewing the appraiser's determination for bad faith or improper conduct. Critical to the Court of Chancery's decision to eschew a more rigorous standard of review was that the appraiser was tasked with determining a narrow issue of fact within its field of expertise—an expertise not shared by the court.

Here, we confront a starkly different scenario. Under Section 15.1, a committee of directors with, as far as we know, no legal training decided nothing but purely legal issues: whether the Committee's authority to interpret Section 15.1 of the Stock Option Agreement extends to the Release in the Grant Notice and, if it did, whether the Release extinguished the previously granted options. Our case law, admittedly scant, and authority from other jurisdictions persuade us that the Court of Chancery is not precluded by the terms of the parties' agreement from reviewing

---

[42] *Id.* (emphasis added).

20

the Committee's resolution of these issues. Such review, moreover, is not limited to considering fraud or bad faith.

In *AIU Insurance Company v. Lexes*, we considered whether an insurance provider could bring an action challenging an appraisal award where "the appraisers awarded amounts for items that were specifically excluded from coverage under the policy, and awarded amounts in excess of the stated coverage for other items."[43] Like the appraisal at issue in *Senior Housing*, the award in *AIU Insurance* was the product of a binding appraisal provision in the parties' contract. The Superior Court rejected the insurer's request for a declaratory judgment that the appraisers exceeded the scope of the appraisal, holding that it could not overturn an appraisal award "absent fraud or a completely irrational result."[44]

We reversed the Superior Court, noting that the insurer was not challenging the appraisers' determination of value or its finality. Instead, the insurer's action sought a determination of the appraisers' authority to include in that valuation items that were expressly excluded from coverage or items beyond coverage limits. Citing cases from Massachusetts and the federal district court for the District of Delaware, this Court concluded that questions about the scope of the appraisal, coverage,

---

[43] 815 A.2d 312 (Del. 2003).
[44] *Id.*

21

exclusions, and "the provisions of the appraisal clause, itself" are legal questions for the courts.[45] We see no reason why the same result should not obtain here.

Admittedly, *AUI Insurance Company v. Lexes* does not address the standard by which expert determinations of legal issues are to be reviewed by the courts. It is generally accepted, however, that judicial review of an expert determination is more rigorous as compared to the review of an arbitration award.[46] Likewise, the review of an expert's legal determinations will be broader than the review of the expert's factual findings.

On this point, the District of Columbia Court of Appeals' opinion in *Adkins Limited Partnership v. O Street Management, LLC*, is instructive.[47] There, the court was asked to review the trial court's handling of an expert-determination provision in the parties' operating agreement. The provision appointed an appraiser to value interests in a commercial real estate company but was unclear as to what interests

---

[45] *Id.* at 314 (citing *Cambridge St. Metal Co., Inc. v. Corrao*, 566 N.E.2d 1145, 1148 (Mass. App. Ct. 1991) ("[J]ust as an arbitrator may exceed his authority by granting relief which is beyond the scope of the arbitration agreement, so too an appraiser can exceed his authority by making an award which is not within the limits of the submission to him. The issue turns on the agreement of the parties. Moreover, it is for the court, not the appraiser, to decide the scope of the submission where that question is in dispute."); *CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F. Supp. 2d 259, 267–68 (D. Del. 2000) (noting that questions about coverage and policy exclusions are legal questions for the courts)).

[46] *See Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 695 (6th Cir. 2012) ("[the] attempt to recast the appraisal provision as an arbitration provision is understandable because the FAA might have afforded a more deferential standard of review to the arbitrator's decision"); *Morris, Nichols, Arsht & Tunnell v. R-H Int'l, Ltd.*, 1987 WL 33980, at *4 (Del. Ch. Dec. 29, 1987) ("this Court is not limited in its review of an appraisal as it would be in the case of arbitration").

[47] 56 A.3d 1159 (D.C. 2012).

were to be valued, prompting the trial court to rule on the issue as a matter of contract interpretation. The Court of Appeals rejected the argument that the trial court usurped the expert's jurisdiction by doing so, holding that, although an expert's findings of fact will be upheld "in the absence of fraud or mistake," when "an appraiser must interpret the meaning of a legal document—a contract between parties—before he may perform his appraisal, that interpretation is subject to judicial review" and "is clothed with no presumption of correctness."[48]

Likewise, in the instant case, the Committee was assigned the authority to "interpret the meaning of a legal document"—the Stock Option Agreement. As a question of law, the Committee's contractual interpretation was subject, under the D.C. court's reasoning, to *de novo* review. We adopt the same approach here. Because Section 15.1 is an expert determination, not an arbitration, and because it requires the Committee to reach legal determinations, not issue findings of fact within its area of expertise, the Court of Chancery is not required to defer to the Committee's conclusions. Thus, the court erred by dismissing Terrell's action for

---

[48] *Id.* at 1167.

lack of subject matter jurisdiction. It should have instead decided Kiromic's motion to dismiss in light of its *de novo* interpretation of the relevant agreements.[49]

F

Finally, we turn to Terrell's contention—one that he chose to lead with in this appeal—that Agreement 3 as interpreted by the Court of Chancery was unconscionable and therefore unenforceable. He makes this case on various grounds. First, Terrell claims that Agreement 3 presents the "rare combination of inadequacy of price . . . coupled with . . . oppressive conduct."[50] Second, he complains that Section 15.1 was unfairly "hidden" in the Stock Option Agreement, "nestled into two sentences"[51] on the tenth page of the agreement. Third, he contends—and this is what we perceive to be Terrell's principal ground for claiming unconscionability—that Section 15.1 is unconscionable because it "allowed agents of the [c]ompany to decide the legal meaning of its own contracts," while sheltering that decision from review by "any neutral adjudicator."[52]

---

[49] Should this conclusion be viewed as rendering the Committee's review a wasteful exercise, we point out that had the Committee decided in Terrell's favor, the company would have been hard pressed to challenge that decision in court. Moreover, we see a parallel between the process invoked here and administrative law claims, which are required to be presented to the agency first yet are subject to judicial review. *See, e.g.*, *Levinson v. Delaware Comp. Rating Bureau, Inc.*, 616 A.2d 1182, 1187 (Del. 1992) ("[W]here a remedy before an administrative agency is provided, relief must be sought by exhausting this remedy before the courts will either review any action by the agency or provide an independent remedy."). And it bears noting that we review an administrative agency's conclusions of law *de novo*. *See Pub. Water Supply Co. v. DiPasquale*, 735 A.2d 378, 381 (Del. 1999).

[50] Opening Br. at 13 (quoting *Ryan v. Weiner*, 610 A.2d 1377, 1381 (Del. Ch. 1992)).

[51] *Id*. at 17.

[52] *Id.* at 16–17.

24

This last contention is undermined by our holding that the Court of Chancery has jurisdiction to review the Committee's legal determinations. And we find no merit in Terrell's alternative unconscionability arguments. Unconscionability—"a concept that is used sparingly"[53]—traditionally requires that "the party with superior bargaining power used it to take unfair advantage of his weaker counterpart."[54] Terrell was not a weak counterpart. Rather, he was a sophisticated party, charged by virtue of his directorship with participating in the management of the company. As such, his claim, which implies that he could not understand the 11-page Stock Option Agreement and, in particular, the straightforward language of Section 15.1, rings hollow.

"[C]ourts are particularly reluctant to find unconscionability in contracts between sophisticated [parties]."[55] We are disinclined to do so here.

## III

For the reasons set forth above, we reverse the judgment of the Court of Chancery and remand for further proceedings consistent with this opinion. Jurisdiction is not retained.

---

[53] *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016).
[54] *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989).
[55] *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 56 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (Del. 2014).

25